# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 616 | **DATE** | 3/14/2002 |
| **CASE TITLE** | Miguel Castillo vs. Chicago Police Officers Jose Zuniga #17694, et al. | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss (No. 10-1) is granted in part and denied in part. Defendants are directed to answer within 21 days.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | **3** number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | MAR 15 2002 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | 20 |
| | Mail AO 450 form. | 3/14/2002 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MIGUEL CASTILLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01 C 616 |
| | ) | |
| CHICAGO POLICE OFFICERS | ) | Judge Rebecca R. Pallmeyer |
| JOSE ZUNIGA #17694, ROLAND | ) | |
| PAULNITSKY 2913 #6503, AND | ) | |
| FORMER POLICE OFFICER | ) | |
| WALTER CIPUN #11885, AND | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
MAR 1 5 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff Miguel Castillo has served eleven and a half years of a state prison sentence for a murder he did not commit. On January 18, 2001, the state dropped all charges against him. Plaintiff now brings this eleven-count action against Chicago Police Officers Jose Zuniga, Roland Paulnitsky, former Chicago Police Officer Walter Cipun, and the City of Chicago (collectively "Defendants"). He alleges that Defendants violated his rights under the federal constitution and Illinois state law by subjecting him to false arrest, false imprisonment, excessive force, civil conspiracy, malicious prosecution, and intentional infliction of emotional distress. Defendants now move to dismiss all of Plaintiff's federal claims as well as his state law claims for false arrest and imprisonment and conspiracy. For the reasons given below, Defendants' motion is granted in part and denied in part.

# FACTUAL BACKGROUND

Until his January 20, 1989 arrest, Plaintiff Miguel Castillo was a resident of Chicago. (Complaint ¶ 2.) At the time of the arrest, the individual Defendants were City of Chicago police officers, with Defendants Zuniga and Cipun assigned to the 14th District and Defendant Paulnitsky assigned to Area 5 Violent Crimes. (*Id.* ¶ 3.)

On May 18, 1988, the decomposing body of Rene Chinea was found in his apartment on the second floor of 2013 North Hoyne Street in the city of Chicago.[1] (*Id.* ¶ 6.) Chinea's hands and penis had been removed, presumably by his murderer. (*Id.* ¶¶ 70, 71.) Neighbors had noticed a strong smell emanating from Chinea's apartment for more than a week, and a Cook County medical examiner subsequently determined that Chinea had died of multiple stab wounds some time between the 8th and 10th of May 1988. (*Id.* ¶¶ 7,8.) Defendant Paulnitsky, who was assigned to investigate the Chinea murder, determined that the chief suspect was Jose Valdez Perez, who had previously attacked and threatened to kill Mr. Chinea. (*Id.* ¶ 9.)

In December 1988, an individual Defendant Paulnitsky believed to be Mr. Perez was arrested in the state of Washington and interviewed by Whatcom County Sheriff's Department Detective Frakes.[2] (*Id.* ¶¶ 11, 12.) During this interview, Mr. Perez told Officer Frakes that "Carlita," a man in Chicago, might have wanted to harm Chinea

---

[1]     The record before the court does not indicate who discovered Mr. Chinea's corpse.

[2]     The pleadings before the court do not indicate the scope or progress of police investigations of the Chinea murder between May and December of 1988.

because one of Chinea's relatives had caused "Carlita" to be attacked. (*Id.* ¶ 14.) Defendant Paulnitsky never questioned Mr. Perez personally, never verified Mr. Perez's story, and never determined Mr. Perez's whereabouts in May 1988. He nevertheless issued a "stop order" directing that Plaintiff be apprehended and questioned. (*Id.* ¶¶ 15-17.) At a hearing on Plaintiff's motion to suppress,[3] Paulnitsky explained that he had received information that Plaintiff was nicknamed Carlita. (*Id.* ¶ 18.)

On January 20, 1989, Defendant Cipun saw Plaintiff in a grocery store at 2702 West North Avenue. (*Id.* ¶ 19.) Defendant Cipun approached Plaintiff and asked his name; Plaintiff replied that he did not speak English. (*Id.* ¶ 21-22.) Plaintiff then used the store cashier as an interpreter to explain that Plaintiff's name was Miguel Castillo. (*Id.* ¶ 22.) Through the cashier, Defendant Cipun told Plaintiff to accompany him back to his squad car. (*Id.* ¶ 23.) After Plaintiff accompanied Defendant Cipun to the squad car, Defendant Zuniga, a Spanish-speaking officer who had been sitting in the car, told Plaintiff that he was wanted on a murder warrant. (*Id.* ¶ 23-25.) In fact, there was no outstanding warrant for Plaintiff at that time. (*Id.* ¶ 20.)

Speaking in Spanish, Plaintiff repeatedly denied that he had killed anyone. (*Id.* ¶¶ 26-27.) Defendants Zuniga and Cipun proceeded to arrest Plaintiff without a warrant and transport him back to the 14th District, where they handcuffed him and told him that he would be questioned further by detectives. (*Id.* ¶¶ 29-30.) Plaintiff

---

[3]     The pleadings before the court do not indicate when the hearing in question occurred.

was interrogated by Area 5 Detective Kaupert on January 20, 1989 and by the individual Defendants the following day. (*Id.* ¶¶ 31, 34.) Throughout these interrogations, Plaintiff repeatedly and emphatically denied killing Mr. Chinea or knowing anything about his death. (*Id.* ¶¶ 32, 35, 37.) During the January 21, 1989 interrogation, Defendant Paulnitsky began to bully and threaten Plaintiff. (*Id.* ¶ 36.) Defendant Cipun grabbed Plaintiff and held him while Defendants Zuniga and Paulnitsky repeatedly slapped and struck him in the head. (*Id.* ¶ 38.) In an effort to coerce Plaintiff into either confessing falsely or signing an untrue inculpatory statement, the individual Defendants threatened Plaintiff; struck him about the face, chest, stomach and arms; pulled his hair; and pushed his head against a wall. (*Id.* ¶¶ 39-40, 42.) Plaintiff continued to deny killing Chinea. (*Id.* ¶ 41.) Despite his denials, Defendants Zuniga and Paulnitsky told Plaintiff that he would be convicted because he had "confessed" to the murder of Mr. Chinea, and Defendant Paulnitsky said that Plaintiff would spend the rest of his life in prison because of the "confession." (*Id.* ¶ 44.)

After this confrontation, Plaintiff alleges, the individual Defendants met with each other and agreed to complete forms falsely stating that Plaintiff had confessed to killing Chinea. (*Id.* ¶¶ 47-48.) Some or all of the individual Defendants reported to prosecutors that Plaintiff had confessed to killing Mr. Chinea in a jealous rage after learning that Mr. Chinea had taken a new lover.[4] (*Id.* ¶ 49.) After repeated

---

[4] Other than the individual Defendants' allegedly false report and some of
(continued...)

4

statements, reports, and interviews provided by the individual Defendants, Plaintiff was improperly charged with the murder of Mr. Chinea. (*Id.* ¶ 50.) On January 24, 1989, Defendant Paulnitsky testified before a Cook County grand jury that Plaintiff had confessed to the murder of Mr. Chinea and had delayed his arrest for months by hiding in different locations. (*Id.* ¶¶ 52-54.) This knowingly false testimony was a basis for Plaintiff's indictment. (*Id.* ¶ 51, 53, 55.)

On July 17, 1989, Plaintiff filed a pro se suit in the United States District Court for the Northern District of Illinois against Defendant Paulnitsky, an unnamed "Interpreter," and the Chicago Police Department, alleging that he was beaten, falsely arrested, and falsely accused of murder because of the individual Defendants' lies. (*Id* ¶ 56.) On October 18, 1989, then-District Judge Ann Williams dismissed Plaintiff's civil rights complaint without prejudice and with leave to reinstate the case after the disposition of the underlying criminal case in state court. (*Id.* ¶ 57; Minute Order ("Judge Williams Minute Order"), *Castillo v. Paulnitsky*, 89 C 5548, Docket No. 14, Exhibit B to Plaintiff's Response to Defendants' Joint Motion to Dismiss ("Plaintiff's Response").)

The individual Defendants lied repeatedly before, during, and after Plaintiff's criminal trial. Defendants Zuniga and Paulnitsky gave false testimony at the pretrial hearings on Plaintiff's motions to quash arrest and suppress statements. (*Id.* ¶ 58.)

---

[4](...continued)
their subsequent testimony, the pleadings before the court contain no indication or implication of any relationship, romantic, sexual, or otherwise, between Plaintiff and the victim.

This testimony included false assertions that Plaintiff had attempted to run away from Defendants Zuniga and Cipun when he first saw them in the grocery store on January 20, 1989 and that Plaintiff had made inculpatory remarks at the store, in the squad car, and at the 14th District Police Station. (*Id.* ¶¶ 60-64.) During the pre-trial hearing on Plaintiff's motion to suppress, Defendant Paulnitsky also falsely testified that Mr. Perez had (a) attributed Mr. Chinea's murder to the murderer's jealousy at Chinea's having taken a new lover, and (b) said that the person named Carlita had frequented Mr. Chinea's apartment. (*Id.* ¶¶ 66-69.) Defendant Paulnitsky testified further that Perez's interviewer, Officer Frakes, had said that Perez interpreted the removal of Chinea's hands and penis as punishment for his unfaithfulness to a lover. (*Id.* ¶ 70.) In fact, as Officer Paulnitsky actually learned from Frakes, Perez interpreted the mutilations as signs that the deceased was an informant and a homosexual; Perez appears not to have addressed the issue of romantic or sexual jealousy at all. (*Id* ¶ 71.) Plaintiff's pre-trial motions were subsequently denied. (*Id.* ¶ 72.)

Before Plaintiff's state court trial began, Defendant Paulnitsky learned from the Cook County State's Attorney that Plaintiff had been in custody in the Cook County jail between March 23 and May 11, 1988. (*Id.* ¶ 73.) Defendant Paulnitsky had previously written reports indicating that Chinea died on May 6, 1988, and had testified before the Grand Jury that Chinea was killed on approximately May 6, 1988. (*Id.* ¶¶ 74-75.) When he learned the dates of Plaintiff's incarceration, Defendant

Paulnitsky altered his testimony and encouraged other prosecution witnesses to change their testimony to indicate that Mr. Chinea died on or after May 11, 1988, the day of Plaintiff's release from jail.[5] (*Id.* ¶ 76.)

At Plaintiff's trial, Defendant Zuniga testified that while sitting in the police car on January 20, 1989, Plaintiff spontaneously and proudly confessed to having done something bad. (*Id.* ¶ 78.) Defendant Zuniga also testified that he had acted as an interpreter during two interrogations attended by Defendants Paulnitsky and Cipun on January 20 and 21, 1989, during which Plaintiff confessed in gory detail and with "a hideous laugh" to the murder and dismemberment of Mr. Chinea. (*Id.* ¶¶ 79-81.) These oral confessions never occurred, and were fabricated by the individual defendants in their written reports and interviews with prosecutors in order to serve as a basis for Plaintiff's indictment, prosecution, and eventual conviction. (*Id.* ¶ 81.) On October 24, 1991, Plaintiff was found guilty of the murder of Rene Chinea and the concealment of a homicidal death. (*Id.* ¶ 82.) Judge Morrissey stated that his finding was based on the weight of the alleged oral confession. (*Id* ¶ 83.)

On December 19, 1991, Judge Morrissey sentenced Plaintiff to forty-eight years in prison. (*Id.* ¶ 84.) From the date of his arrest on January 20, 1989 until September 22, 2000, Plaintiff remained incarcerated at the Cook County Jail, the Joliet Detention

---

[5]     The court notes that Defendant Paulnitsky appears to have contradicted the medical examiner's determination that Chinea died between the 8th and 10th of May 1988 twice: both in his initial reports and testimony that the death occurred on May 6th and in the subsequent testimony and reports that inculpated Plaintiff and assigned May 11 as the date of Chinea's murder. *See id.* ¶¶ 7, 8.

7

Center, and the Pontiac Correctional Center. (*Id.* ¶¶ 85-86.) On May 23, 2000, Plaintiff and his attorneys filed an Amended Post-Conviction Petition, which requested that his conviction be reversed and that he be granted a new trial based on his absolute innocence. (*Id.* ¶ 88.) The Petition cited new evidence corroborating previously-produced evidence showing that China was killed between May 7th and 9th of 1988, when Plaintiff was in jail. (*Id.* ¶ 89.) On September 20, 2000, Cook County State's Attorney Thomas Gainer indicated in court that his office would not oppose Plaintiff's Petition; the Petition was subsequently granted and Plaintiff's previous conviction was vacated. (*Id.* ¶¶ 91, 92.) On September 22, 2000, Plaintiff was released from custody for the first time since his arrest on January 20, 1989. (*Id.* ¶ 93.) On January 18, 2001, Cook County Circuit Court Criminal Judge Schultz granted the State's motion to *nolle prosequi* the charges and dismiss all charges against Plaintiff. (*Id.* ¶ 95.) Plaintiff filed the complaint initiating this action on January 30, 2001.

## DISCUSSION

### A.  Standard of Review

A motion to dismiss a complaint pursuant to FED.R.CIV.P. 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead tests whether the claimant has properly stated a claim. *See Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). In deciding a motion to dismiss, the court will consider all well-pleaded allegations of the complaint as true, and will draw all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch*,

494 U.S. 113, 118 (1990); *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001). Dismissal is proper only if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Slaney v. International Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).

## B.    Plaintiff's Federal Claims

### 1.    Fourth Amendment Claims

#### a.    False Arrest, False Imprisonment, and Excessive Force

Plaintiff alleges that the individual defendants violated his Fourth Amendment rights by falsely arresting and imprisoning him, and using excessive force in interrogating him. Defendant responds that these claims were not timely filed because they accrued at the time of Plaintiff's arrest or shortly thereafter and did not depend upon the future course of state court criminal proceedings against Plaintiff.

Under most circumstances, the statute of limitations would clearly bar Plaintiff's Fourth Amendment claims. The statute of limitations for § 1983 suits arising in Illinois is two years. *Shropshear v. Corporation Counsel of Chicago*, 275 F.3d 593, 594 (7th Cir. 2001). While federal courts follow the tolling laws of the state where the alleged injury occurred, *Hardin v. Straub*, 490 U.S. 536, 539 (1989), the legal question of when § 1983 suits accrue is governed by federal law. *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985); *Gonzalez v. Entress*, 133 F.3d 551, 554 (7th Cir. 1998). The Seventh Circuit has noted that § 1983 causes of action for improper arrests or searches accrue

at the time of the challenged arrest or search. *Perez v. Sifel*, 57 F.3d 503, 505 (7th Cir. 1995). *See also Gonzalez*, 133 F.3d at 555 ("Application of excessive force at a police station violates the Constitution and is immediately actionable . . . ."). Under this line of cases, Plaintiff was obligated to file suit by approximately January 21, 1991, two years after the Fourth Amendment violations associated with his arrest and interrogation allegedly occurred.

As Plaintiff points out, however, the court can not conclude its timeliness analysis here, in light of the Supreme Court's decision in *Heck v. Humphrey*. 512 U.S. 477 (1994). In *Heck*, a state prisoner filed a § 1983 action against county and state prosecutors, alleging, among other things, that they had destroyed exculpatory evidence that could have proved the prisoner's evidence. Noting concerns of judicial finality and consistency, the Supreme Court concluded that § 1983 damages actions necessarily requiring a plaintiff to prove the unlawfulness of his conviction or confinement were not cognizable. *Id.* at 486. Accordingly, such claims must include proof that the underlying conviction or sentence has been reversed or otherwise invalidated to be heard in federal court. *Id.* at 486-87. Plaintiff argues that his false arrest, false imprisonment, and excessive force allegations necessarily conflict with his arrest and conviction, and were therefore not judicially cognizable until the criminal charges against him were resolved in his favor on January 18, 2001. Non-cognizable allegations can not be said to have accrued under a statute of limitations, Plaintiff urges, and therefore his January 30, 2001 complaint was timely. As Defendants note,

however, the Seventh Circuit has rejected this argument, holding that under *Heck*, Fourth Amendment claims for improper searches or seizures do not necessarily invalidate subsequent sentences or convictions. *See Copus v. City of Edgerton*, 151 F.3d 646, 648-49 (7th Cir. 1998) (suspect may be properly convicted despite having suffered unlawful arrest or search); *Washington v. Summerville*, 127 F.3d 552, 556 (7th Cir. 1997) (applying same analysis to excessive force claim).[6] Thus, no matter how unsettling Plaintiff's particular factual allegations may be, as a matter of law, *Heck* does not change the fact that "a claim asserting a violation of the fourth amendment necessarily 'accrues' at the time of the unlawful search or seizure . . . ." *Gonzalez*, 133 F.3d at 553. In practical terms, *Heck* did not delay the accrual of Plaintiff's Fourth Amendment claims.

Plaintiff argues further that his false arrest, false imprisonment, and excessive force claims were tolled on October 18, 1989, when then-District Judge Williams dismissed his pro se civil suit without prejudice and with leave to reinstate after disposition of the underlying criminal case. (Judge Williams Minute Order.) Plaintiff's

---

[6] Plaintiff contrasts the Seventh Circuit's recent categorical approach to the accrual of false arrest claims with older cases in which the court remanded for consideration of whether a particular § 1983 claim would have to be barred by *Heck*, and invites this court to consider this issue an "open question." After the clear language of the Seventh Circuit's recent cases on point, the court considers the question closed. *See, e.g., Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 897 (7th Cir. 2001) ("In applying *Heck* in general . . . we have held that any § 1983 claim for damages resulting from a false arrest is not barred by *Heck* and accrues immediately after the arrest . . . ."); *Copus v. City of Edgerton*, 151 F.3d 646, 649 (7th Cir. 1998) ("[W]e have held that a claim asserting a violation of the Fourth Amendment necessarily 'accrues' at the time of the unlawful search or seizure").

original suit--alleging that Officer Paulnitsky and an unnamed "civil interpreter" wrongfully arrested, attacked, and threatened him; fabricated his confession; and caused him mental anguish—was filed on July 17, 1989, less than six months after the alleged events and well within the applicable statute of limitations. (Castillo Federal Complaint, 89 C 5548, Ex. A to Plaintiff's Response.)    In Plaintiff's view, the underlying criminal case against him was only disposed of when the charges against him were dropped on January 18, 2001.

The court finds this argument unpersuasive. First, as Defendants point out, the Plaintiff's 1989 suit arguably should have been stayed, not dismissed. In its most important holding on point, *Simpson v. Rowan*, 73 F.3d 134 (7th Cir. 1995),  the Seventh Circuit Court of Appeals considered the case of a prisoner who had filed a February 1993 *pro se* civil rights complaint in the Northern District of Illinois, while awaiting trial on a murder charge in the Circuit Court of Cook County. The civil rights complaint alleged, among other things, that the prisoner had suffered a false arrest, wrongful search, and a malicious prosecution. After the prisoner was convicted of murder in June 1993, the district court dismissed the case, citing *Younger*, and observing that the issues raised by the § 1983 action would "necessarily involve the very issues to be considered on appeal in the state court proceedings." *Id.* at 135, *quoting Simpson v. Rowan*, No. 93 C 534, 1993 WL 311783, at *1 (N.D. Ill. Aug. 12, 1993). In addressing the prisoner's appeal of this dismissal, the Seventh Circuit initially concluded that plaintiff's Fourth Amendment claims were not barred by *Heck*

12

*v. Humphrey.*  The court noted that *Younger* abstention was "appropriate while the case works its way through the state appellate process," but that the trial court erred in dismissing, rather than staying, the case.  *Id.* at 138-139.  In reaching this final holding, the court noted that "[t]he practical effect of the district court's dismissal is that [petitioner] is now time-barred from bringing his federal rights suit; his claims became barred when the applicable two-year statute of limitations period expired [two years after his arrest]."  *Id.*

The *Simpson* decision established two principles that are relevant here.  First, *Younger* abstention bars federal courts from hearing cases only until the conclusion of all state court appeals.  *See Simpson*, 73 F.3d at 138; *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 369 (1989) ("[f]or *Younger* purposes, the State's trial-and-appeals process is treated as a unitary system"); *Mitts v. Marszewski*, No. 97 C 2029, 1998 WL 26151, at *2 (N.D. Ill. Jan. 14, 1998) (granting stay under *Younger* and directing defendants to notify court of status within 30 days of final judgment in underlying criminal case); *Patterson v. Leyden*, 947 F. Supp. 1211, 1219 (N.D. Ill. 1996)(staying suit under *Younger* pending resolution of prisoner's state court appeals).  *See also Sumpter v. Bolingbrook Police Dep't*, No. 94 C 1306, 1996 WL 145955, at *5 (N.D. Ill. Mar. 27, 1996) (denying *Younger* stay where expiration of deadline removed "any possible friction between this Court [and] the state appellate process").  Second, district courts in the Seventh Circuit addressing cases where money damages were not available in state court are required to stay and not dismiss cases

under *Younger*, so that otherwise timely federal actions will not be unfairly barred by statutes of limitations. In applying these principles, this court concludes that Plaintiff's federal civil rights action accrued no earlier than the later of either the conclusion of his final state criminal appeal, or the Seventh Circuit's *Simpson* opinion establishing that Plaintiff's 1989 federal action should have been stayed. The pleadings before the court suggest that Plaintiff exhausted his direct appeals in the state appellate process on June 2, 1995; *Simpson* was issued on December 29, 1995.[7] Therefore, the court concludes that the District Court's 1989 dismissal of Plaintiff's civil case tolled the two-year statute of limitations until, at latest, December 29, 1997, not 2001.

Plaintiff offers several additional arguments for his position that his false imprisonment claim did not accrue until charges were dropped against him in 2001. First, he contends that this court should distinguish § 1983 causes of action for false arrest and false imprisonment on the grounds that false imprisonment claims accrue only after a party has been exonerated and released from prison. Neither Plaintiff nor the court has located any federal cases distinguishing false arrest and false

---

[7]  Defendants' pleadings indicate that Plaintiff exhausted his direct appeals in the state appellate process on June 2, 1995. (Defendants' Joint Reply in Support of their Motion to Dismiss, at 7.) Plaintiff has neither challenged this assertion, made any allegations regarding his appeals in state court, nor appended a copy of the state court docket to his Complaint. For Plaintiff's claim to have remained timely under the applicable two-year statute of limitations, his appeals would have to have endured until at least January 30, 1999, more than seven years after his 1991 conviction. On the facts before it, this court can not reasonably infer that Plaintiff's state court appeals were exhausted only two years before the filing of his 2001 complaint.

14

imprisonment in this way, however. While Plaintiff cites a number of cases for the proposition that the state of Illinois recognizes a discrete false imprisonment claim, a concern that will be addressed more fully below, these cases do not give the court an adequate basis for distinguishing federal § 1983 claims for false arrest and false imprisonment for purposes of accrual. Nor can the court pinpoint an underlying constitutional basis for distinction. If Plaintiff's false imprisonment claim sounds under the Fourth Amendment, it must have accrued at the time that he knew or had reason to know that he had been inappropriately seized. *Gonzalez*, 133 F.3d at 553. The Seventh Circuit has explicitly rejected the suggestion of a "continuing seizure" under the Fourth Amendment, *see, e.g., Summerville*, 127 F.3d at 560 n.3; *Reed v. City of Chicago*, 77 F.3d 1049, 1052 n.3 (1996); *Wilkins v. May*, 872 F.2d 190, 193 (7th Cir. 1989); accordingly, the Fourth Amendment would appear to govern police conduct in this case only until Plaintiff received a preliminary hearing. To the extent that Plaintiff alleges ongoing misconduct by the individual Defendants after his hearing, that alleged misconduct–including the suppression and fabrication of evidence–falls more logically under the Due Process deprivation of a fair trial theory discussed below than under a false imprisonment claim. Accordingly, the court concludes that Plaintiff's § 1983 false imprisonment claim accrued on or about the date of his January 20, 1989 arrest and is therefore no longer timely.[8] *Cf. Reed*, 77 F.3d at 1054

---

[8]     Plaintiff argues further that his false imprisonment claim is clearly controlled by *Heck* because the court addressed an "essentially identical claim" in that case. As noted below, Plaintiff's false imprisonment claim differs significantly in its
(continued...)

(distinguishing hypothetically valid malicious prosecution claim and time-barred false arrest claim).

Finally, Plaintiff urges that Defendants are judicially estopped from arguing that his claims are now time-barred. In essence, Plaintiff contends, Defendants' current defense contradicts the position they took in the 1989 federal action, where they argued successfully that the court should abstain until the underlying state criminal proceedings were resolved. The doctrine of judicial estoppel forbids a party from obtaining a judicial victory on one ground and then obtaining a victory in a subsequent case on an inconsistent second ground. *Bethesda Lutheran Homes and Servs., Inc. v. Born*, 238 F.3d 853, 857-58 (7th Cir. 2001). The doctrine is a discretionary one designed to protect the courts from manipulation by litigants. *In the Matter of Cassidy*, 892 F.2d 637, 641-42 (7th Cir. 1990). Courts will apply judicial estoppel when (1) the later position is clearly inconsistent with the earlier position; (2) the facts at issue are the same in both cases; and (3) the party to be estopped has convinced the first court to adopt its position. *See Ogden Martin Sys. of Indianapolis, Inc v. Whiting Corp.*, 179 F.3d 523, 527 (7th Cir. 1999).

The court does not believe that Defendants are barred by judicial estoppel in this case. Defendants' arguments for application of the statute of limitations in this case are not clearly inconsistent with their prior arguments for *Younger* abstention. As articulated by the Supreme Court, *Younger* abstention requires federal courts to

_____

[8](...continued)
constitutional underpinnings from the malicious prosecution claim addressed in *Heck*.

16

exhibit "comity," defined as "a proper respect for state functions." *Younger v. Harris*, 401 U.S. 37, 44 (1971); *see also Barichello v. McDonald*, 98 F.3d 948, 954 (7th Cir. 1996). In sum, *Younger* abstention derives from concerns about balancing the respective powers of state and federal government. While the Defendants' success in seeking abstention undoubtedly deferred Plaintiff's original civil suit, any resulting delay was a consequence and not a premise of their abstention argument.[9] As noted above, Defendant's *Younger* arguments only kept Plaintiff out of federal court until the exhaustion of his state court appeals; it was Plaintiff's failure to act after either the exhaustion of his appeals or the issuance of *Simpson* that made many of his federal claims untimely. The court concludes that Defendants' argument on this motion is not squarely inconsistent with the argument for abstention and therefore declines to rule that they are judicially estopped.

### b. Malicious Prosecution

Plaintiff's other Fourth Amendment allegation is a claim that the individual defendants maliciously prosecuted and wrongfully convicted him.[10] As the Seventh

---

[9] *See* Defendant's Motion to Dismiss the Complaint, *Castillo v. Paulnitsky*, 89 C 5548, at 3, Exhibit C to Plaintiff's Response: "The State of Illinois has a vital interest in maintaining its criminal justice system and prosecuting persons accused of heinous crimes. The criminal prosecution [of Plaintiff] is still in its pre-trial phase, and under the *Younger* abstention doctrine, federal courts should not entertain a claim for damages under 42 U.S.C. 1983 if disposition of the damages claim would involve ruling on issues in dispute in a pending state criminal proceeding."

[10] While the Complaint could be read to suggest that "malicious prosecution" and "wrongful conviction" are discrete wrongs, the court follows the Seventh Circuit's analysis in *Newsome v. McCabe*, 256 F.3d 747, 749 (7th Cir. 2001), in addressing both
(continued...)

Circuit has recently held, "the existence of a [malicious prosecution] tort claim under state law knocks out any constitutional theory of malicious prosecution" because the provision of a state remedy affords all the process that was due.[11] *Newsome*, 256 F.3d at 750. In this case, if Plaintiff's allegations are taken as true, then his malicious prosecution claim will sound under state law and his § 1983 claim must accordingly be dismissed. *Id.*, *see also Corbett v. White*, No. 00 C 4661, 2001 WL 1098054, at *5 (N.D. Ill. Sept. 17, 2001).

## 2.    Due Process

Plaintiff is thus left without either a federal malicious prosecution claim or a viable Fourth Amendment claim. Plaintiff's federal claims are not necessarily extinguished, however, because as the Seventh Circuit noted under similar circumstances, Plaintiff may "have a due process claim in the original sense of that phrase . . . ." *Newsome*, 256 F.3d at 752. In *Newsome*, a wrongfully convicted party who had spent fifteen years in prison sued five officers from the Chicago Police Department, alleging in part that two of the defendants had failed to alert prosecutors to exculpatory evidence and had suborned perjury from eyewitnesses. *Id.* at 749. The *Newsome* court affirmed the district court's denial of the two individual officers'

---

[10](...continued)
allegations under the rubric of malicious prosecution.

[11]    The Seventh Circuit issued this ruling after the filing of Plaintiff's Complaint and Defendants' Joint Motion to Dismiss. Because both parties promptly and forthrightly addressed *Newsome* in their subsequent briefs, the court finds no prejudice in ruling on Defendants' Motion to Dismiss without asking the parties to refile.

qualified immunity defense. The court noted that for purposes of the qualified immunity inquiry, it was clearly established that police officers could not withhold exculpatory information from prosecutors. *Id.* at 752-53. Moreover, while prosecutors enjoy absolute immunity for their prosecutorial decisions,

> [i]f officers are not candid with prosecutors, then the prosecutors' decisions—although vital to the causal chain in a but-for sense—are not the important locus of action. Pressure must be brought to bear elsewhere. Prosecutors kept in the dark by the police . . . won't improve their performance with or without legal liability for their conduct. Requiring culpable officers to pay damages to the victims of their actions, however, holds out promise of both deterring and remediating violations of the Constitution.

*Id.* at 752. *See Corbett*, 2001 WL 1098054, at *5 (complaint alleging that police officers fabricated statements and failed to reveal exculpatory information to prosecutors stated due process claim). *See also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)("If police officers have been instrumental in the plaintiff's . . . prosecution, they cannot escape liability by pointing to the decisions of prosecutors . . . to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.").

Defendants argue that even if Plaintiff has stated a due process claim for denial of a fair trial, his action must still be dismissed because they enjoy absolute immunity for all actions that might have prevented Plaintiff's trial from being fair. The court is persuaded by part, but not all, of this argument. It is well-settled law that police officers enjoy absolute immunity for their testimony in criminal trials, whether truthful or knowingly deceptive. *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983). To the extent that Plaintiff's due process claim alleges false testimony by the individual

19

Defendants, it must therefore be dismissed.[12]

The remainder of Defendants' causation argument is less persuasive, however. They contend that their alleged pre-trial misconduct—the preparation of false statements, reports, and interviews—can not subject them to liability because only their allegedly false trial testimony could have violated Plaintiff's right to a fair trial. Defendants cite *Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994), for the proposition that it is the use of fabricated evidence *at trial* that violates the Constitution, and not the independent fabrication of evidence. *Id.* at 796, citing *Mooney v. Holohan*, 294 U.S. 103 (1935). This proposition is correct, but incomplete: as the Seventh Circuit has held on several occasions, police officers are liable for constitutional violations when they suppress exculpatory evidence or fabricate inculpatory evidence so that prosecutors base their prosecutorial decisions on incomplete or spurious evidence. *See Newsome*, 256 F.3d at 751; *Buckley*, 20 F.3d at 796-97 (noting that under Seventh Circuit precedent, "the police who bilked the prosecutor were liable for the injury their deceit caused"); *Jones*, 856 F.2d at 994 ("[A] prosecutor's decision to charge . . . a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield

---

[12]     Plaintiff argues that the individual Defendants were "complaining witnesses" who lacked absolute immunity for their testimony. *See, e.g., Malley v. Briggs*, 475 U.S. 335, 340-341 (1986); *Cervantes v. Jones*, 188 F.3d 805, 809-810 (7th Cir. 1995). As the Seventh Circuit recently observed in *Newsome*, however, courts need only address the "complaining witness" doctrine if they recognize a constitutional tort of malicious prosecution. *Newsome*, 256 F.3d at 750. In light of its disposition of Plaintiff's federal malicious prosecution claim, this court need not consider whether the individual defendants were complaining witnesses before determining that they enjoy absolute immunity for their testimony in court.

a police officer who deliberately supplied misleading information that influenced the decision").[13] These cases teach that police officers can violate defendants' right to a fair trial by suppressing or fabricating evidence in ways that *cause unfair trials to happen.* As Judge Posner noted in *Jones,* "a man [is] responsible for the natural consequences of his actions" in constitutional tort cases as in other cases. *Id.* at 993, quoting *Monroe v. Pape,* 365 U.S. 167, 187 (1961). Because an unfair trial is a predictable consequence when police officers systematically mislead prosecutors, the court concludes that Plaintiff has stated a due process claim with regard to his allegations that the individual Defendants fabricated statements, reports, and interviews.

### 3. Conspiracy

Plaintiff alleges that the individual Defendants conspired to violate his rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments. Defendants again argue that Plaintiff's claim was not timely filed under the two-year Illinois statute of limitations for § 1983 actions. The Seventh Circuit has held that a civil conspiracy claim accrues "when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Wilson v. Giesen,* 956 F.2d 738, 740 (7th Cir. 1991) (internal citations omitted). Accordingly, the preceding timeliness analysis applies to Plaintiff's conspiracy claim. Any conspiracy claims deriving from the alleged false arrest, coerced confession, or use of excessive force accrued

---

[13] Defendants seek to distinguish *Jones* from the current case because a mistrial was declared before the plaintiff in *Jones* could be tried. This procedural circumstance does not make the Seventh Circuit's reasoning and language any less germane to the case at hand, however.

immediately and are now time-barred. Plaintiff has sufficiently stated a due process claim for the deprivation of his rights to a fair trial, however, and accordingly, the alleged conspiracy to deprive him of those rights accrued only when all charges were dropped against him in January 2001.

## C. State Law Claims

Defendants argue that Plaintiff's state law claims for false arrest, false imprisonment, intentional infliction of emotional distress, and civil conspiracy are barred by the Illinois statute of limitations. Plaintiff raises a number of arguments for the proposition that his state law claims are timely. There is no dispute that Plaintiff's claims are governed by the Illinois Local Government and Governmental Employees Tort Immunity Act, which provides a statute of limitations of one year for civil actions commenced against state employees and entities. 745 ILCS 10/8-101.

### 1. False Arrest and False Imprisonment

Because Castillo was arrested on January 20, 1989, he had until January 20, 1990 to file any state law claims that accrued at the time of his arrest. The false arrest and false imprisonment claims fall into this category. Under Illinois law, a plaintiff seeking to establish false arrest or false imprisonment must prove that 1) the plaintiff was restrained or arrested by the defendant; and 2) the defendant acted without reasonable grounds to believe that the plaintiff committed an offense. *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 474, 564 N.E.2d 1222, 1231 (1990). Under this standard, Castillo knew, or reasonably should have known of the facts underlying his false arrest claim at the time he was arrested. Because he did not file his most recent

federal complaint until January 30, 2001, the court finds that the false arrest claim is time-barred.

Plaintiff has pointed to several cases concluding that Illinois false imprisonment claims accrue only after a prisoner's release from custody. *See Hernandez v. Sheahan*, No. 93 C 1668, 1993 WL 257486, at *6 (N.D. Ill. July 8, 1993) (state law claim for false imprisonment did not accrue until plaintiff was released from electronic monitoring). *See also Cooper v. Butler*, 92 C 5604, 1995 WL 399009, at *5 (N.D. Ill. June 29, 1995), *aff'd*, 172 F.3d 52 (7th Cir. 1999) (noting in dicta that state law claim for false imprisonment did not accrue until plaintiff's exoneration and release). Notably, however, there is a significant body of conflicting precedent within the district. *See, e.g., Pierce v. Pawelski*, No. 98 C 3337, 2000 WL 1847778 (N.D. Ill. Dec. 14, 2000); *Burge v. Harvey Police Officers*, 1997 WL 4569 (N.D. Ill. Sept. 25, 1997); *Gora v. Edgar*, No. 95 C 4087, 1996 WL 11938 (N.D. Ill. Jan. 10, 1996). Because the parties have not fully addressed the issue of when Plaintiff's state law claim for false imprisonment accrued, the court reserves judgment on this point, and invites further briefing thereon.[14]

---

[14] The court will not expect the parties to revisit arguments it has already addressed. As explained earlier, the court concludes that the 1989 dismissal of Plaintiff's federal civil suit did not delay the accrual of his state law claims until 2001. Even assuming that Plaintiff's false arrest and false imprisonment claims were tolled by Judge Williams's dismissal of his federal complaint, this court can not reasonably infer that his state-law appeals survived long enough to place his January 30, 2001 complaint within the one-year statute of limitations. *See* note 7.

Plaintiff urges this court to equitably toll his state law claims until the date of his exoneration or release.[15] In light of this court's disposition of this case, the equitable tolling argument pertains only to Plaintiff's time-barred false arrest claim. In summarizing the law of equitable tolling, an Illinois court has noted that the doctrine may be appropriate when a) defendant has actively misled plaintiff; b) plaintiff "in some extraordinary way" has been prevented from asserting his rights; or c) plaintiff has timely asserted his rights mistakenly in the wrong forum. *Clay v. Kuhl,* 189 Ill. 2d 603, 614, 727 N.E.2d 217, 223 (2000), citing *Ciers v. O.L. Schmidt Barge Lines, Inc.,* 285 Ill. App. 3d 1046, 1052, 675 N.E.2d 210, 214 (1st Dist. 1996). Equitable tolling principles should be applied with caution. *Ciers,* 285 Ill. App. 3d at 1052, 675 N.E.2d at 214.

With regard to Plaintiff's false arrest claim, Defendants did not fraudulently induce Plaintiff into failing to assert his rights. Defendants' alleged conduct in violently attempting to coerce a confession and in telling Plaintiff that a "confession" he never uttered would be used against him should have put him on notice that his arrest was improper. Perhaps most significantly, the individual Defendants' conduct did not prevent Plaintiff from alleging false arrest in his first federal complaint. Nor did Plaintiff's imprisonment prevent him from asserting his rights: his first federal action was filed while in custody. Moreover, he appealed his conviction in the state

---

[15]    Following the parties' lead on this issue, the court has addressed equitable tolling only as Illinois courts would apply the doctrine to Plaintiff's Illinois state claims. The court is amenable to further briefing on the issue of equitable tolling if the parties deem it appropriate.

courts until as late as 1995, suggesting he did have access to the state courthouse. As sympathetic and difficult as Plaintiff's wrongful incarceration may have been, it does not rise to the level of a five-week hospitalization, a circumstance which an Illinois court found sufficiently "extraordinary" to have kept a party from filing his case in timely fashion. *See Marshall v. Metropolitan Water Reclamation Dist. Ret. Fund.*, 298 Ill. App. 3d 66, 73-74, 697 N.E.2d 1222, 1227 (1st Dist. 1998).

Plaintiff's strongest argument is that he erroneously asserted his rights in a federal forum that lacked jurisdiction to adjudicate them. While this good faith error might warrant tolling Plaintiff's state false arrest claim for some period of time, such as the months that his federal complaint remained on Judge Williams' docket, it is difficult to see how Plaintiff's initial error in filing would warrant tolling his case for an additional ten years after the error was discovered. Accordingly, the court concludes that equitable tolling is inapplicable to Plaintiff's false arrest claim. Plaintiff points to a recent state court decision equitably tolling four wrongfully convicted plaintiffs' claims for malicious prosecution, false imprisonment, intentional infliction of emotional distress, and conspiracy, *Williams v. County of Cook*, 97 L 4886 (1998), but Cook County Circuit Judge Maddox's brief unreported opinion in that case does not lend this court an adequate basis for following his equitable tolling ruling.[16]

---

[16]     The other authorities Plaintiff offers are readily distinguishable. In one, *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 657 N.E.2d 12 (1st Dist. 1995), the court declined to toll the statute when the plaintiff had the requisite knowledge and opportunity to join an additional defendant before the statute ran. *Id.* at 275 Ill. App. 3d 1085, 657 N.E.2d 21. In the other case he cites, the court tolled a statute of

(continued...)

## 2.    Intentional Infliction of Emotional Distress ("IIED")

Defendants argue that because all of the allegedly illegal conduct complained of by Plaintiff occurred between 1989 and 1991, Plaintiff's state law claim for intentional infliction of emotional distress is time-barred.   This argument is not persuasive in light of several recent rulings that IIED claims accrue only when state criminal proceedings are terminated.  *See Evans v. City of Chicago*, 00 C 7222, 2001 WL 1028401, at * 14 (N.D. Ill. Sept. 6, 2001) (state law IIED claim accrued when state dropped charges); *Pierce v. Pawelski*, No. 98 C 3337, 2000 WL 1847778 (N.D. Ill. Dec. 14, 2000) (where claim alleged defendants' participation in wrongful prosecution and false testimony at trial, IIED claim did not accrue until acquittal at trial); *Treece v. Village of Naperville*, 903 F. Supp. 1251, 1259 (N.D. Ill. 1995), *aff'd*, 213 F.3d 360 (7th Cir. 2000).  Plaintiff's IIED and malicious prosecution claims incorporate the same alleged misconduct by the individual Defendants, and the court concludes that both claims accrued only after the charges against Plaintiff were dropped.[17]

## 3.    Conspiracy

Defendants argue that Plaintiff's claim for conspiracy to maliciously prosecute, falsely arrest, falsely imprison, and intentionally inflict emotional distress is time-

---

[16](...continued)
limitations for a wrongful death action to permit the joinder of that action with the decedent's widow's claim for loss of consortium under the Illinois Structural Work Act. *See Shrock v. Shoemaker*, 159, 159 Ill. 2d 533, 548, 640 N.E.2d 937, 944 (1994). Neither case addresses circumstances similar to those here.

[17]    Defendants do not dispute the fact that Plaintiff's state malicious prosecution claim is timely.

barred. In light of the preceding analysis, the court concludes that Plaintiff's conspiracy claim is time-barred with regard to allegations of false arrest. He has stated a timely claim with regard to the alleged conspiracy to maliciously prosecute and intentionally inflict emotional distress, however. While Defendants cite Illinois case law for the proposition that a tort action accrues at the date on which a party's personal or property right is violated, *Austin v. House of Vision*, 101 Ill. App. 2d 251, 255, 243 N.E.2d 297, 299 (1st Dist. 1968), the cited opinion limits itself to instances in which there is only a single overt act causing harm. Plaintiff's timely conspiracy claims allege a series of acts ranging from the suppression of exculpatory evidence and fabrication of inculpatory evidence to the subsequent failure to redress Plaintiff's wrongful conviction. Without expressing an opinion on the merits of these pleadings, the court concludes that they allege more than a single overt act. Under Illinois law, Plaintiff has pleaded the prima facie elements of a civil conspiracy claim by alleging an agreement to commit an unlawful act followed by the commission of an overt and tortious act in furtherance of the agreement. *Adcock v. Brakegate Ltd.*, 164 Ill. 2d 54, 63, 645 N.E.2d 888, 894 (1994).

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss (No. 10-1) is granted with regard to Plaintiff's Fourth Amendment claims and state false arrest claim, and denied with regard to his federal Due Process claim and state IIED claims. Defendants' motion is granted with regard to Plaintiff's federal and state conspiracy claims only insofar as Plaintiff's underlying claims are dismissed. Counts I (i.e.

malicious prosecution); II; III; IV; V (i.e. conspiracy to falsely arrest, coerce confession or exert excessive force); and VII are dismissed. Counts I (due process deprivation of a fair trial); V (conspiracy to deprive Due Process rights to fair trial), VI, VIII, IX (i.e. conspiracy to maliciously prosecute and to intentionally inflict emotional distress), X, and XI survive. Pending further briefing on Plaintiff's state claims regarding false imprisonment or conspiracy to falsely imprison, the motion to dismiss those claims is denied without prejudice. Defendants are directed to answer within 21 days.

ENTER:

Dated: March 14, 2002

REBECCA R. PALLMEYER
United States District Judge